JAMES H. MURDOCH *vs.* ROBERT E. STRANGE.

*Municipal Corporations—Effect of Blank Ballot in Election of Officer— Invalidity of Usage as to Counting Blank Ballots—Ordinance as to Time of Filing Bond.*

When a municipality is empowered by charter to provide for the appointment of certain officers, and an ordinance provides that these officers shall be chosen by ballot, then, acccording to the principles of the common law, a blank ballot cannot be counted in estimating the total number of votes cast; and the municipality has no power to declare by resolution, or adopt by usage, as a rule of procedure, that in the election of officers a blank ballot shall be counted as a vote.

Those who are present at a meeting of a corporate body and refrain from voting, or cast blank ballots, ought to be considered as acquiescing in the result declared by the majority of those who do vote.

The Mayor, Counsellor and Aldermen of Annapolis constituting the City Council and numbering in all eight members, met and agreed by reso-

lution, to proceed to the election of a Market Master, by ballot.   S then received four votes, M three votes and there was one blank ballot. *Held*, that S was elected.

The City Code of Annapolis requires that the Market Master give bond, etc., to be approved by the Mayor, within ten days after his election. When the above-mentioned election was held the Mayor declared that there was no election and, consequently, S did not give bond within ten days, but after a judicial decision had been rendered the Mayor agreed to accept S's bond, and it was then tendered.   *Held*, that under these circumstances, S had not forfeited his right to the office by failure to give bond within ten days after his election.

Appeal from the Circuit Court for Anne Arundel County (THOMAS, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Isaac Lobe Straus,* for the appellant.

The usage, or rule of practice, proved without any dispute at all, requires that in an election of city officials by the corporate body of Annapolis, a blank paper, deposited by one of the electors as a ballot, is to be counted as one of the ballots cast, but shall not be counted in favor of any of the persons voted for in the election.   In other words, it is a vote of dissent, and not of assent; a negative vote, and not an affirmative vote.   The testimony thus establishing that a blank ballot, under the usage, practice and rule of procedure of the body in question, is to be given full force and effect, a member casting a blank ballot cannot be regarded as taking no part, or doing nothing, and thereby, because of his mere presence, acquiescing in the action of the majority of those whose several ballots contain a definite name.

The proof moreover shows that in more than thirty ballotings, held at various times on the 20th, 23rd and 30th of July, the usage as a rule of proceeding was invariably recognized and applied in practice with the unanimous acquiscence of all the members of the corporation, the whole elective assembly repeatedly acting upon it without any question or exception taken by anybody and with a united ratification of the results

of the numerous ballotings as declared in accordance with it by the presiding officer.

Finally the explicit and positive proof is that the corporate elector who cast the blank ballot did it upon the faith of the usage, which the proof shows was not merely a matter of record and constant practice for thirty years or more, but virtually of common notoriety at Annapolis, and with the deliberate understanding and intention, after making sure he was right by taking the advice of a former counsellor of the city and a leading member of the Annapolis bar, that the blank vote which he cast should be counted as one of the whole number of ballots cast, but not as a vote for Mr. Strange.

The usage, as proved above, being neither unreasonable nor repugnant to the Charter of Annapolis, establishes the law of the municipality as to the counting of a blank ballot and disposes of this case by ascertaining that the balloting for Market Master at the meeting of July 20th, did not result in the election of any successor to Mr. Murdoch. The effect to be given to a blank ballot in the election of its officers is *in the absence of contrary statutory provision* a matter properly determinable by the usage or practice of the corporation of Annapolis, and if the usage dealing with that subject is reasonable and not repugnant to the charter of the city, it is not to be set aside because not in harmony with the law in some other places; but should be upheld as ascertaining the law upon the subject in question.

The usage, confessedly, is not in conflict in any respect with any provision, express or implied, of the Charter of Annapolis. On the contrary, the charter confers upon the corporation, in unqualified terms, full plentitude of power over the appointment af its officers; including specifically the Market Master. (*Hooper* v. *New*, 85 Md. 583–5; 1 *Dillon Mun. Corp.* sec. 212), accompanied with the further power to "settle its rules of proceedings" in the performance of its business and functions. Neither is it, nor indeed it could be, fairly suggested that the usage established by the testimony is unreasonable. It has been observed for many years without any complaint what-

ever in regard to it, and its maintenance by so many successive councils can only indicate that it must have operated to the satisfaction and advantage of the people of Annapolis, and is therefore both equitable and salutary.

That the law of a given locality or elective assembly upon such a subject is, in the absence of explicit statutory provision, determined by usage or customary practice is an elementary principle announced by all the authorities without dissent. *Cushing Law, etc., Legis. Assem.*, sec. 1826, p. 708; sec. 283, p. 109.

And the author shows that the whole of the parliamentary law, with all its forms and methods of proceeding, springs from the very sources from which the law and practice in the present case, as constituting the procedure of the corporate assembly of Annapolis, are shown by the witnesses and the testimony to have been drawn, namely, "partly in usages which are nowhere recorded in express terms on the journals, but are constantly recognized and practiced upon," "partly in precedents of proceedings which are considered as declaratory of the law and usage of Parliament, etc."

The case of *Yulee* v. *Mallory*, 1 Bartlett Election cases, 608, a decision of great weight upon a question of this sort, deals precisely with the point under consideration, showing that the effect to be given to blank ballots in ballotings by elective assemblies is, in the absence of statutory provision, to be determined by usage and customary practice. The decision was rendered by the unanimous report of a Select Committee of the Senate of the United States, of which committee the late distinguished Maryland jurist, the Hon. James Alfred Pearce, was a member. The report in question was adopted by the unanimous vote of the whole Federal Senate. It decided that where Mr. Yulee, the contestant for a seat in the Senate, had received in the joint convention of the Florida Legislature 29 votes, and 29 blank ballots were cast, that the blank ballots were to be counted as negative ballots, so that Mr. Yulee, not having received a majority, was not elected, and the election was a nullity.

The case of the contested election of Mr. Stockton, which was decided in the United States Senate in 1866, presented the question whether it was competent for the *joint convention* of the two Houses of the Legislature of New Jersey, in absence of a statute or resolution *passed by the Legislature itself*, to adopt a valid resolution providing that "any candidate for the United States Senate receiving a *plurality* of the votes of the members present shall be declared duly elected." The Judiciary Committee of the Senate, embracing some of the foremost lawyers of that generation, include Judge Lyman Trumbull as its chairman, and also the late Reverdy Johnson, decided and reported the question affirmatively, and sustaining the report of the committee upon the floor of the Senate, Judge Trumbull, Mr. Johnson, Mr. Hendricks, Mr. Stockton and others relied upon the usage of the joint conventions of New Jersey, which had obtained from 1794 until 1865, and under which they had always assumed and exercised the right to determine, without legislative enactment or resolution, the manner of electing Senators from that State.

It is well settled that a statute or ordinance may be construed according to the custom or usage of the place where it applies. Thus, speaking of the inspection Act for Baltimore City, the Court in *Frazier* v. *Warfield*, 13 Maryland, 303, laid down the rule as "founded in reason and common-sense" that "when a statute is applicable to a particular place only, such words may be construed by usage at that place." And in *Sherwin* v. *Bugbee*, 16 Vt. 444, JUDGE REDFIED, in passing on the validity of a school meeting, declared that in construing statutes applicable to public corporations "Courts will attach no slight weight to the uniform practice under them." In *King* v. *Salway*, 9 B. & C. 435, LORD TENTERDEN said: "A usage, not inconsistent with a charter, nor repugnant to it, may continue, notwithstanding the acceptance of a charter." LORD KENYON said in *Rex* v. *Bellringer*, 4 Term, 821, "that contemporaneous usage had always been considered as of great importance in the construction of charters, a variety of cases at all times abundantly evince."

In *King* v. *Hoyte*, 6 Term. 432, "The uniform usage for the last 40 years is laid before us, which unopposed, is evidence of a usage from all time; and such prescription usage is evidence of a charter conferring such a right of election on the majority of the existing burgesses." See also *Rex* v. *Varlo*, per Ld. Mansfield, Cowper, 250; *Miller* v. *Eschbach*, 43 Md. 1, 6–8; *Ins. Co.* v. *Farquhar*, 86 Md. 672–3; *Union Bk.* v. *Ridgely*, 1 H. & G. 324; 3 *Clark & Marshall Corp.*, p. 1782 note; *Library Hall Co.* v. *Library Assn. Co.*, 173 Pa. St. 30; *Newling* v. *Francis*, 3 Term R. 189; *Scales* v. *Key*, 11 A. & E. 819.

There can be no doubt that the determination of the effect to be given to a blank ballot in the election "by ballot" held by the corporate body of electors is a subject properly regulated by a rule of procedure of the corporate body. It seems simply supererogatory to argue this plain truism. The sum and substance of the matter is this: A rule of procedure, as defined in *Heiskell's case*, 65 Md. 148, is "a rule adopted by a legislative body as to the mode and manner of conducting the business of the body." To appoint or elect its city officers is the business of the body corporate of Annapolis. To prescribe what effect a blank ballot shall have in this particular business is to prescribe that particular detail of the mode and manner of conducting the business in question.

. That a rule of procedure, governing municipal elections, may be established by usage. See *Rex* v. *Johnson*, 6 C. L. & F. (H. of L.) 41, affirming 5 A. & E. 488; *Rex* v. *Westwood*, 4 Bligh. (H. of L.) 217; *Rex* v. *Ashwell*, 12 East. 22; *Rex* v. *Bird*, 13 East. 367.

The authorities are almost too numerous for citation, showing that a matter of this nature may be properly controlled and disposed of by a rule of procedure. *Regina* v. *Griffith*, 17 A. & E., N. S. 164 (directly in point); *State* v. *Hoyt*, 2 Oregon, 246; *Atkins* v. *Phillips*, 8 So. Rep. 430; *Swindell* v. *State*, 134 Ind. 155; *Armitage* v. *Fisher*, 74 Hun. 171; *People* v. *Cahill*, 39 N. Y. Sup. 375; *Coleman* v. *Dobbin*, 8 Ind. 160; *Morrison* v. *Lawrence*, 98 Mass. 221; *Davies* v. *Saginaw*, 87

Michigan, 439; *Cushing Legislative Assemblies*, secs. 794, 1480, 1491.

Even in the absence and irrespective of usage or settled practice the blank ballot cast on July 20th, was properly counted by the Mayor and the Municipal Assembly as one of the ballots cast in the election, but not as a ballot in favor of the appellee, so that, as declared at the time, there was no election. It is conceded in this case that as there were eight present at the meeting of July 20th, it required a majority of those present to elect a Market Master. Without citation of further authorities, which are exceedingly numerous, if there could be any doubt on that point, such doubt is dismissed by the case of *Hooper* v. *Creager*, 84 Md. 195.

Legislative and judicial authorities agree that in elections by a definite or select assembly, blank ballots are to be counted as non-concurring votes in estimating whether any candidate has received a majority of the votes cast. A case explicitly decisive of the question occurred in the election of a Speaker on May 22nd, 1809, at the first session of the Eleventh Congress. A quorum consisting of a majority of the whole number being present, the House proceeded by ballot to the choice of a Speaker. The tellers reported that the result of the ballot was that there were for Joseph B. Varnum, 60; Nathaniel Macon, 36; Timothy Pitkins, Jr., 20; Roger Nelson, 1; C. W. Goldsborough, 1; blank ballots, 2.

John Randolph, the leader of the House, declared that "he conceived that there was no question that they had *not elected* their Speaker, and that it was their business to proceed to an election. They were certainly competent to elect the officers of their own body, and he hoped they would do it *more majorum*—after the fashion of their ancestors." Mr. Randolph then moved that the House proceed to ballot a second time for Speaker, which having been done, Mr. Varnum had a clear majority of votes (65 against 54), and was declared elected. *Benton's Abridgement, Debates of Congress*, vol. 4, p. 125.

This remained the acknowledged law of the House of Representatives until September 15th, 1837, when it was *expressly*

*changed by the following rule of procedure*, adopted by the
House upon motion of Levi Lincoln (formerly Mr. Jefferson's
Attorney-General): *"In all ballotings, blanks shall be rejected
and not taken into the count in enumeration of votes or reported
by the tellers."* This remains the rule of the House, as re-
ported in the revision of 1880, at the present time. See *Hinds'
Parliamentary Precedents of the House of Representatives*, sec.
1125, p. 597. And so the Code of Massachusetts expressly
provides "blank pieces of paper shall not be counted as bal-
lots." *Rev. Statutes*, ch. 4, sec. 13.

The case of *State, ex rel. Cole* v. *Chapman*, 44 Connecticut,
595, is an explicit and positive adjudication upon the subject
of this inquiry. *Lawrence* v. *Ingersoll*, 88 Tennessee, 52; 17
Am. St. Rep. 870, also decides the point in question flatly in
favor of the appellant, and lays down precisely the doctrine of
the United States Senate, the House of Representatives and
the Supreme Court of Connecticut, and of the other authori-
ties upon the effect of a blank ballot in elections by a select
and definite electorate. See also *Keough* v. *Holyoke*, 156 Mass.
403; *People* v. *Conklin*, 7 Hun. 188; *Com.* v. *Wickersham*, 66
Pa. St. 134; *Anniston* v. *Davis*, 98 Ala. 626; 39 Am. St. Rep.
94; *Queen* v. *Griffiths*, 17 Ad. & Ellis N. S. 164.

*Price* v. *Brock*, 79 N. C. 600, presents an almost complete
analogy to the case under consideration; the Board of Alder-
men of the city of Wilmington consisted of ten members, and
in an election of a Chief of Police for that city, on the sixth
ballot, all the members being present, five votes were cast for
the plaintiff, four votes for the defendant and one blank ballot
was deposited. The clerk of the board announced that the
plaintiff was elected; but the board decided to take another
ballot upon which the defendant received six votes and was
declared elected. The Court without deciding how the blank
ballot was to be regarded, held that it was the exclusive prov-
ince of the Board of Aldermen of the city to declare the result
of a ballot for Chief of Police, and that as they had not de-
clared the plaintiff elected, and for that reason the plaintiff was
not elected.

In *State* v. *Deliesseline* (2 McCord, S. C. 52), it was held, p. 62, that where eleven constitute a quorum of a board of trustees of a college "six constitute a majority of that quorum, and the *concurrence of that number, when eleven are present*, has always been held conclusive in the whole body," and where *twenty* constitute the majority or a *quorum* of the whole number of a select body, the Court held, p. 63, that "if a majority of the whole number be required and a bare majority meet, they must be unanimous," but that if a majority of the whole number is not required, where the eleven are present, "the *concurrence of a majority* only should be required." And so in *Labourchette* v. *Municipality*, 2 La. Am. 519, in the able argument of counsel, which was adopted by the Court, it is said : "The *lex majoris partis* is the law of all councils, elections, etc., where not otherwise provided. The majority here means the *major part of those who are present* at a regular corporate meeting." *Citing Bacon's Abr., Title Corp. E.*, No. 7; 2 *Kent Comm.*, 293; 12 *Kyd Corp.*, 308, 400, 424; *Jefferson's Manual*, sec. 41.

The two cases last referred to are cited and adopted by JUDGE DILLON as the authority for his rule, which he lays down that "the *majority of those present must concur*." 1 *Dill. Mun. Corp.*, sec. 282, as follows: "In the absence of a special provision the major part of those present at a meeting of a select body must concur in order to do any valid act." See also sec. 283.

And that learned author expresses a dissent from or at least a serious doubt as to the doctrine laid down in *Rushville Gas Co.* v. *Rushville*, 121 Ind. saying : "The Court held that the resolution having received the vote of a majority of a quorum, although *not* of a majority *of all present*, was legally adopted. *It deserves further consideration* whether *this result is consistent with the majority rule applicable to definite bodies*." 1 *Dillon, Mun. Corp.*, 4 ed., note at foot of p. 369.

And similarly the latest work on the Law of Corporations in dealing with the subject of corporate meetings lays down the rule on the authority of *Com.* v. *Wickersham*, 66 Pa. St. 134,

and *People* v. *Conklin,* 7 Hun. 188, as follows: "If a director who is present does not vote at all on a resolution he is bound to be counted in the negative for the purpose of determining whether the resolution has been carried by a majority vote." 3 *Clark and Marshall on Corporations,* sec. 681; see also sec. 676. See also 10 *Am. & E. Ency.,* p. 760, sec. 6.

The cases relied on by the Court below and by counsel for the appellees are:

(1) Cases of popular elections by indefinite constituencies, such as *Walker* v. *Oswald,* 68 Md. 150, and *Cass Co.* v. *Johnson,* 95 U. S. 360, in which the doctrine, *which is not at all involved in this case,* is laid down that those who, in such elections, absent themselves or abstain from voting, are considered as acquiescing in the result declared by a majority of those actually voting; or

(2) Cases where, in different assemblies, only a single proposition or candidate is proposed and there is an absolute and willful (some of the Judges say "contumacious") refusal on the part of some of the electors to take any part or vote at all in the election or other proceeding of the body, such conduct is considered as an acquiescence in the action of those who do take part. Such are the cases of *Oldnow* v. *Wainwright,* or *Rex* v. *Foxcroft,* 2 Burrow's, 1017; *Gosling* v. *Veley,* 4 H. L. Cas. 679; *Green's case,* 37 Ohio St. 227; *Atty-Genl's case,* 62 N. H. 383; *City of Rushville case,* 121 Ind. 106; *Morton* v. *Youngerman,* 89 Ky.; *Wheeler* v. *Crum,* 98 Ky.

Between such cases and the present case of an elector attending a meeting of the corporate assembly, voting in favor of a motion to proceed to the election of corporate officers, taking part in the election wherein several candidates are proposed and casting a blank ballot upon the faith of the uniform and long-settled practice of the corporate body to give effect to such a ballot as a non-concurring vote, and having moreover observed such an effect repeatedly given, with the acquiescence of the whole assembly, to blank ballots cast in numerous previous elections for corporate officers *at the same meeting,* the distinction is so broad and obvious that it would seem to be impossible to overlook it.

The Journal of the Municpal Assembly, approved and adopted by all its members, declares that the appellee was not elected Market Master, and conclusively rebuts his claim, as presented in this case, to the office in question.   It is the exclusive province of the municipal body itself to declare the result of its elections, and as the journals of its proceedings *declare that the appellee was not elected*, their declarations in this respect are conclusive upon him and upon this Court, and outside of every other question raised in these proceedings, effectually dispose of the claim of the appellee *as presented herein* to the office in question.   The case of *Price* v. *Block*, 79 N. C. 600, is flatly decisive of this proposition.   And to the same effect are :   *Mayor, etc.,* v.   *Davis*, 98 Ala. 629; *Keough* v. *Holyoke*, 156 Mass. 405; *Putnam* v. *Langley*, 133 Mass. 204; *Baker* v. *Cushman*, 127 Mass. 195.

The minutes of the proceedings of a public corporation required by law to be kept in writing make up a public record importing absolute verity.   They are evidence of all that was done, and that nothing more was done; and they cannot be attacked or contradicted in a collateral action to which the board are not made parties.   *Price* v. *Brock*, 79 N. C.; *Mayor*, *&c.,* v. *Davis*, 98 Ala. 629; *Keough* v. *Holyoke*, 156 Mass. p. 405; *State* v. *Simmons*, 40 La. Ann. 758; *Gaither* v. *Tax Collector*, 40 La. Ann. 362; *Gilbert* v. *New Haven*, 40 Conn. 102; *Cabot* v. *Brit*, 36 Vt.   349; *Bradbury* v. *Bluton*, 69 Me. 194; *People* v. *Zeyst*, 23 N. Y. 140; *Hallect* v. *Boylston*, 117 Mass. 469;   *Lawyer* v. *R. R. Co.*, 62 N. H. 135.   The Council has full power to correct its minutes at a subsequent meeting.   1 *Dillon*, sec. 293, sec. 297 and notes;   15 *Am. & Eng. Ency.* 1077, sec. 7 and note; *Mayor* v. *Davis*, 98 Ala. 634.

If the appellee were duly elected he has his remedy.   By direct proceedings for that purpose he may have the minutes of the corporation corrected so as to declare that he was elected, it being the province of the corporate body exclusively to declare the result of its elections.   But, as said in *Davis* v. *Mayor*, 98 Ala. 635–6, "So long as the minutes of the Council, they cannot be impeached or varied in a collateral proceeding by parol testimony.

Under the decision in Maryland the provisions of the City Code of Annapolis requiring the giving of bond within a prescribed time are mandatory, and the appellee having failed to tender or present a bond within ten days after his alleged election on July 20, the office remains in the possession of the appellant.

The peremptory language in which they are expressed show that they are mandatory. It has been decided in a large number of the American States and in a multitude of cases that the failure to take the oath or give the bond within the prescribed time vacates the office, so that it cannot be restored by a subsequent compliance with the statute. This has been decided in 37 Ark. 486; 52 Ala. 66; 57 Cal. 620, 35 Cal. 509; 14 Fla. 277; 27 Ind. 496, 100 Ind. 489; 7 Kan. 372; 83 Ky. 142; 19 Nev. 370; 60 Pa. St. 136; 77 Va. 518, 265, 347, 300, 78 Va. 116; 58 Miss. 556; 4 Cranch. Ct. Ct. 255; England, 2 Bro. P. C. 289. In Maryland this is undoubtedly the rule. *Hecht* v. *Coale*, 93 Md. 692, 695; *Archer* v. *State*. 74 Md. 443; *Thomas* v. *Owens*, 4 Md. 189; *Baltimore & Drum Point R. R. Co.* v. *Pumphrey*, 74 Md. 112, 113.

The whole doctrine upon this subject is briefly stated in 23 *Encyclopedia of Law*, pp. 357, 358–9; where the learned editor states that in Maryland a statutury provision requiring bond within a prescribed time as a qualification for office is absolutely mandatory, and cites the case of *Archer* v. *State,* 74 Md. 443.

*James W. Owens* and *Carroll T. Bond,* for the appellee.

Casting a blank, upon taking a vote by ballot, is a refusal to vote, and the member casting it is regarded as having assented to the result of the votes cast.

By sec. 17 of the Charter of the city of Annapolis, the corporate body was empowered to provide for the appointment of its officers; and in the City Code, Art. 29, sec. 1, of that municipality, provision is made that about the time of this meeting of July 20th, 1903, the body shall elect "by bal-

lot" its officers, including the Market Master, the office for possession of which this suit is brought.

A ballot is one form of voting, different from other forms only in that of the voter, to maintain secrecy, writes his wish or choice on a piece of paper and deposits the paper along with the other votes cast. Like all other forms of votes, it is an expression of the voter's wish in respect to the matter to be determined. Authority in support of this definition is hardly necessary, but is found in *Anderson's Law Dict.*, *"Ballot ;" Cooley's Const. Lim.* (6 ed.) p. 760; *Bourland* v. *Hildreth*, 26 Cal. 194; *Brisbin* v. *Cleary*, 26 Minn, 108–109.

Anyone entitled to vote who deposits simply a blank piece of paper, does not, of course, express his wish or choice, and therefore refrains from voting. Any other construction would be reading upon the paper what is manifestly not there. Instead of voting, the one who deposits the blank deposits his voting material only.

It is argued that casting a blank ballot amounts to something more than refraining from voting, in that it is a more positive act and is at least a declaration of intention not to vote for the candidates proposed; that it notes the presence of the member casting it, and therefore requires that he be counted among those present in determining the number necessary to elect, and is a tacit expression, if such a thing can be, of a wish to prevent election by insisting upon being counted in determining the result. The act is clearly nothing more, however, than abstaining from voting; no more positive than would be an oral declaration of an intention not to vote. The presence of the member is already sufficiently noted; and mere presence of a member who takes no part in the business in hand will not count to defeat action by the other members. The business in hand at the meeting on July 20th, it must be remembered, after it had been resolved to hold an election, was solely to obtain the name of a candidate from each member so that the choice of the greater number might be ascertained.

In this body there are eight members, all entitled to votes,

and if all had voted, five would have been necessary to a choice. Alderman Martin expressed no choice, wishing by such silence, as he himself testifies, to prevent election at the time, so that he was lending his efforts, not to the accomplishment of the object resolved upon and the business in hand, but to the accomplishment of his wish on the question whether or not an election should be held; a question already disposed of by the body. *Cushing's Law of Legislative Assemblies* (1874), sec. 114.

It has been held by this Court, and in all but two or three of a large number of cases elsewhere, in which the question has arisen, that when a quorum of a body has assembled, and the body duly proceeds to the election of officers, the refusal of some of the members present to vote for the candidates proposed, will not prevent the election by the votes actually cast, even though those voting are less than a majority of all members present. This rule obtains in assemblies of a definite number of members, or "definite assemblies," as they are called. According to this strong preponderance of authority, Strange, having received four votes against three for Murdoch, was elected, notwithstanding Mr. Martin's refusal to vote for either candidate. *Walker* v. *Oswald,* 68 Md. 150; *Willcock on Municipal Corporations*, sec. 546; *Grant on Corporations*, 204, 206.

And it seems clearly reasonable that mere bodily presence of a member at a meeting in which he makes no effort to assist in the determination of matters to be acted upon, should not be permitted to hinder the other members present and acting, any more than if he were not present. *Cooley's Constitutional Limitations,* (6 ed.), p. 893, n.; *Horr & Bemis, Municipal Police Ord.* 42; 1 *Beach Public Corporations*, sec. 157; *Gosling* v. *Veley,* 4 House of Lords Cases, 679; *State* v. *Green,* 37 Ohio St. 227, *County of Cass* v. *Johnson,* 95 U. S. 360.

The rule was applied in the following cases also: *United States* v. *Ballin,* 144 U. S. 1. In which a vote in the House of Representatives was, yeas, 138; nays, 0; not voting 189. *State* v. *Yates,* 19 Mont. 239, 37 L. R. A. 205; *Rushville Gas*

*Co.* v. *Rushville,* 121 Ind. 206, 6 L. R. A. 315; *State, &c.,* v. *Dillon,* 125 Ind. 65; *State* v. *Vanosdal,* 131 Ind. 388, 15 L. R. A. 832; *Attorney-Gen.* v. *Shepard,* 62 N. H. 383; *People* v. *Clute,* 50 N. Y. 451, 461, cited in *Walker* v. *Oswald; State* v. *Parker,* 32 N. J. Law, 341; *Launtz* v. *People,* 113 Ill. 137; *Booker* v. *Young,* 12 Gratt, 303; *Smith* v. *Proctor,* 130 N. Y. 319, 14 L. R. A. 403; *Wheeler* v. *Commonwealth,* 98 Ky. 59; *Citizens, &c.,* v. *Williams,* 40 La. Ann. 422, 439, which cites *Walker* v. *Oswald.*

All those authorities which hold that votes knowingly cast for ineligible persons are to have no greater effect than if the intended voter had made no effort to vote, are decisive of this question. Certainly the appellant cannot contend that Mr. Martin's blank should have any greater effect given to it than if his blank actually contained the name of some ineligible person. The latter would be much more clearly a dissent from the choice of one of the other candidates being voted for. Yet votes cast for persons known to be ineligible are lost and cannot defeat an election. *Cooley's Constitutional Limitations,* (6 ed.), p. 932, n. 1; *Price* v. *Baker,* 41 Ind. 572; *King* v. *Hawkins,* 10 East. 211; *King* v. *Parry,* 14 East. 549.

In *Reg.* v. *Coaks,* 3 Ellis & Blackburn, 249, &c., LORD CAMPBELL, C. J., said : "Now it is the law, both the common law and parliamentary law, and it seems to me also common sense, that, if an elector will vote for a man who he knows is ineligible, it is as if he did not vote at all, or voted for a non-existent person; as it has been said, as if he gave his vote for The Man in the Moon." See *People* v. *Clute,* 50 N. Y. 463.

The City Code of Annapolis requires that within ten days of his election, each officer shall file a bond, or else his election shall be considered of no effect and shall be vacated. There is a dispute among the authorities whether such a provision is mandatory or directory. Similar provisions have been held directory only. *Clark* v. *Ennis,* 45 N. J. Law, 69; 1 *Beach Public Corporations,* secs. 312 and 313.

But for the purposes of this case, it is sufficient to note that

imperative as such a statute is, in terms, it will not be construed as requiring the impossibility and absurdity of filing a bond during a contest over the election, and during the time when the person required to receive the bond would not consider it. For this reason, the provision of the Code must be construed as requiring the bond to be filed only within ten days after the election of Strange was acknowledged, and the municipal officers were ready to consider it. *Mechem on Public Officers*, sec. 266, notes; *Throop on Public Officers*, sec. 172; *State* v. *Kraft*, 20 Oregon, 28; *State* v. *Johnson*, 100 Ind. 489, 491; *Flatan* v. *State*, 56 Texas, 93, 99; *Ross* v. *Williamson*, 44 Ga. 501, 504; *State* v. *Barnes*, 51 Kans. 688, 691.

This requirement of the law Strange complied with. On August 24th, after the vote on Mr. Riley's appeal on August 19th, from the refusal of the Mayor to declare Strange elected, Strange offered his bond, but as half of the body considered he had not been elected, the bond was not received. On October 1st, when the mandate of the Circuit Court for Anne Arundel County, directing the corporate body to declare Louis S. Clayton elected, and to receive his bond, was served on the assembly, the election of Strange and all the other city officers voted for on July 20th, was then acknowledged by the body, and Strange's bond was presented and approved by a vote of five to three. He therefore filed his bond as soon as was permitted, and sooner than the Code required.

PAGE, J., delivered the opinion of the Court.

By the Charter of the City of Annapolis, the Mayor and City Council have power "to provide for the appointment and define the duties" of various officers, including that of Market Master. By Art. 29, sec. 1 of the City Code, it is enacted, that the Market Master shall "be chosen by ballot," on the second Monday of July in each and every year, to serve until the second Monday in April next ensuing, or, "in case of failure on the part of the corporation then to elect, until another election shall take place thereafter."

On the 20th July, 1903, the Mayor, Counsellor and Alder-

men, constituting the City Council, and numbering in all eight members, met, and by resolution, regularly offered and adopted, agreed to proceed at once to elect officers of the city corporation. The appellant and the appellee were thereupon put in nomination for Market Master; and upon a vote by ballot being taken, R. H. Strange received four votes, J. H. Murdoch received three votes, and there was one blank ballot. The Mayor thereupon declared there was no election. On July 23rd, 1903, and again on 30th July, the same persons were balloted for, with like results; that is, at each of the ballotings, Murdoch received three votes, Strange four, and there was one blank ballot, and on each occasion the Mayor declared there had been no election.

The main question raised by these proceedings is presented by the contention of the appellant that by the proof taken and set forth in the record, there exists a usage and practice of the Corporation of Annapolis whereby a blank ballot shall not be counted for any of the persons voted for in the appointment of the city officials by the corporate electors; but shall be counted as a ballot in estimating the total number of votes cast and in determining whether any person voted for has received a majority. If it be admitted, for the sake of the argument, that a rule or by-law of a corporation may be established by proof of custom long maintained and acquiesced in by its members, yet it is clear, (*Miller* v. *Eschbach*, 43 Md. 6), that inasmuch as the M. & C. C. of Annapolis are a municipal corporation established for political purposes and possessing no powers except such as have been expressly, or by necessary implication, given by the law creating it, no by-law or rule can be established by custom, which is beyond its authority to adopt by resolution or ordinance. Admitting, therefore, further, for the sake of the argument, that the custom contended for by the appellant has been fully established (which however we do not decide), there arises the pertinent inquiry, how far the corporate authorities of the city of Annapolis have power to adopt as a rule of procedure, in the election of its officers, a rule whereby a blank ballot is to "be

counted as a ballot in estimating the total number of votes cast;" or in other words, may it under its conceded power of establishing a rule of procedure, declare by resolution, or in any other manner, not only that a blank ballot, shall be counted, but also that it shall be counted as a vote of dissent. We are not inquiring, just now, whether such a rule would be reasonable; but whether it is in conformity to the proper exercise of the power granted by the charter.    By the 17th section of that instrument, the power to the Council is, "to provide for the appointment" of Market Master and certain other officers.    It may be clear, that the particular method of the appointment is left to the judgment and discretion of the corporation; that is, whether the method of appointment should be by resolution of the Council, or by a a *viva voce* vote, or by ballot.    However the Council may decide, in this respect, the method itself and the several steps by which the final choice is to be determined, must be in harmony with the fundamental principles, recognized and understood by the common law to be applicable.    For instance, if the Council provided by its ordinance, as it has done here, that the appointment shall be by ballot, the Council could not establish a rule, by custom or otherwise, whereby a minority of the votes cast would be effective to elect, or whereby a number less than a quorum could transact the business.    It seems to be clear, as was said in *Trowbridge* v. *Newark*, 46 N. J. L. 144, that a power to provide for the appointment, granted to a municipal corporation, merely authorizes the "Common Council to pass ordinances prescribing a mode and manner of manifesting their will, whether to do so, by ballot or resolution or ordinance, or by mere motion adopted *viva voce.*"

The municipal body may make such rules, as conform to or are *not in conflict with* the essentials of law making; but such rules must not be in derogation of the law of the land, whether common law or statutory.    *Cooley Const. Lim.* (6 ed.), 187; *Heiskell* v. *Mayor, &c.*, 65 Md. 149; 1 *Dillon on Munci. Corp.*, sec. 319 (4 ed).    Or to state the proposition with reference to the particular facts of this case, if the method

of appointing the Market Master be fixed by the ordinance of the Council to be by *ballot*, then all the common law rules that apply to that method of acting must be observed; and no rule can be established by custom or otherwise, that will substantially affect the determination of the majority, otherwise than according to the principles of the common law. The power conferred upon the City Council by sec. 17 of the Charter, was therefore completely exercised by the passage of sec. 1 of Art. 29 of City Code, in respect to the method of the selection of Market Master, whereby it was provided that he should be chosen by ballot. How the ballots shall be counted, and the majorities determined, where matters fixed by the principles of the common law. In *Heiskell* v. *Mayor* (*supra*), it was stated in substance, that where the Charter is silent, the common law fixes the majority as the legal body, and for the Municipal Council to undertake to make a greater number, is to attempt to change the common law; and by a parity of reasoning, it would seem to be equally clear, that when a municipal body without special authority from the Charter or from some legislative enactment, under the pretence of making a rule of procedure, undertakes to affix to the ballots cast, or to any one of them, or to a blank ballot, a significance, other than that given or allowed by the principles of the common law, whereby the final result of the balloting is or may be entirely changed, it is in fact neither more nor less, than an attempt to change the common law; and such an undertaking would be illegal and void.

The matter then amounts to this, is it in accordance with the principles of the common law, that the blank ballot in a case like this, should be counted in estimating the total number of votes cast, and therefrom determining, whether any person voted for has received a majority.

The "blank ballot," referred to in these proceedings, was a blank piece of paper, having on it no words or marks of any kind whereby the meaning and intent of the person who deposited it, may be ascertained. To denominate such a paper a ballot, would seem to miscall it. It is in fact nothing; it can-

not be expressive of any intention; no rule or method of interpretation can relieve it of its dumbness. It no more indicates a preference for one of the candidates, than for another. If there is but one candidate, there is nothing to indicate assent to the one; nor where there are two or more candidates, as a vote of assent or dissent, as to either candidate. In the case of *Yulee* v. *Mallory*, 1 Bart. Election cases, 608, the report of the committee referred to the "blank ballots as beyond doubt nullities," and in *Stockton's case*, they were regarded only because of a rule of the State Legislatures that cognizance should be taken of such ballots. It is true, that in some jurisdictions, it has been held, that "a blank vote cannot be in a technical sense a ballot, but is nevertheless an act of negation—affirmative in showing that another voter acted, and negative in determining the majority," *Lawrence* v. *Ingersoll*, 88 Tenn. 88. In this case C. J. TURNEY dissented; holding that "a blank vote was only an expression of indifference;" and in this opinion he is supported by much authority, and it seems to us by principle. A ballot is a form of expression for a candidate to be voted for. If the paper falls short of expressing such a wish, it is defective; certainly, if it expresses nothing, it lacks all of the essential elements of a ballot. If it contains the name of a man, who is known to the voter to be ineligible the ballot cannot be counted, because the object of ballot then would be not to elect, but to prevent an election. *People* v. *Clute*, 50 N. Y. 463; *Reg*. v. *Coaks*, 3 Ellis & Blackburn, 249.

It is not easy to perceive how a blank ballot can be given any significance. If it expresses nothing and therefore cannot be counted for or against either of the candidates voted for, how can it serve to indicate assent to the person receiving a plurality of the other votes cast, or of dissent? How can a blank piece of paper, be construed to express an intent of any kind? If it be regarded as an expression of dissent, it may be asked to what does he dissent? Is it to the holding of the election? And if this may be so, how can the person who deposits it, by a mere arbitrary interpretation of the

act of placing a blank piece of paper in a ballot-box, be permitted to defeat the votes of electors, who are endeavoring to perform an important public duty. "As all electors have the same right, it follows, that each of them is bound to exercise his particular right, in such manner, as to allow to every other elector, the free and full exercise of the same right on his part; which would not be the case if one elector had the power by means of a blank, to defeat the vote of another for a particular candidate, without himself voting for anybody." *Cushing's Law of Legislative Assemblies*, (1874), sec. 114.

There are some cases when an effective action of the legislative body requires a majority of all the members, or of all the members present. In such a condition of legal requirement, the question of the significance of a blank ballot cannot arise; for there must always be at least the concurrence, of a fixed number of votes. In *Yulee* v. *Mallory*, it required a majority of all the members to elect. In *People* v. *Conklin*, 7 Hun. 188, the statute rendered indispensable a majority of the trustees *present*. The Court said in that case referring to the blank ballot "if a presumption is to be entertained on the subject it is just as reasonable that it should be indulged in the defendant's as in the relator's favor." In *Swartz* v. *Wickersham*, 66 Pa. St. 134, a majority of the whole number of directors present must concur. These and like cases, do not throw much light upon the subject of the significance to be attached to a blank ballot.

It would seem therefore, impossible and if not so, at least not reasonable, to make any presumptions with reference to the meaning of the voter who deposits a blank ballot. It is a safer principle, it seems to us, and one more in harmony with sound reasoning, to hold that the voter who deposits a blank piece of paper in the ballot-box throws away his vote ;—because the paper he has voted is not expressive of any meaning whatever and therefore utterly null and void. It is true, that a blank ballot may sometimes operate as a vote of assent; not that any presumption as to its meaning may properly be drawn, but because, being ineffective for every purpose, the

person casting it, has left unopposed the votes of the other electors, and thereby, it may be said, assents to the election of the candidate, who receives a majority of votes. *Grant on Corporations,* 204 *et seq.; Willcock on Mun. Corp.,* sec. 546; *Cooley Const. Lim.,* 771, (6 ed.); where it is said: "A blank ballot being of such a character, and not to be counted, it follows, that a candidate may be ,chosen without receiving a majority or plurality of votes of those who actually participate in the election."

In this State it is settled that in elections where there is an indefinite number of voters, "those absenting themselves and those who being present abstain from voting, are considered as acquiescing in the result declared by a majority of those actually voting, even though, in point of fact, but a minority. of those entitled to vote, really do vote." *Oswald* v. *Walker,* 65 Md. 146–150. This principle is supported by the overwhelming weight of authority in this country and England.. From *Oldknow* v. *Wainwright,* 2 Burr. 1017, decided in 1760, down to *United States* v. *Ballin,* 144 U. S. 1, there is hardly a single decision to the contrary. *Cooley Const. Lim.,* ϵ ed., p. 771; *County of Cass* v. *Johnston,* 95 U. S. 360; *Reg.* v. *Coaks,* 3 Ellis & B. 249; *Price* v. *Baker,* 41 Ind. 572; *Willcock on Mun. Corp.,* sec. 546; *Grant on Corp.,* p. 204, *et seq.; Citizens, &c.,* v. *Williams,* 49 La. Ann. 422; *Smith* v. *Proctor,* 130 N. Y. 319; *People* v. *Clute,* 50 N. Y. 461. We do not understand the counsel for the appellant to assail this doctrine, as applicable to elections by an indefinite number of voters; but he contends it does not apply to elections by definite assemblies, where he contends a different rule should prevail.

To constitute a corporate assembly at common law, there must always be present, a quorum, consisting of at least a majority of the number of all the members, and no valid act can be done without a · majority of a quorum. Dillon (*supra*), in his work on · corporations says: "The common law rules as to quorums and majorities, established with reference to corporate bodies consisting of a definite number of corporators, have also been applied ·

to the common council, or select governing body of our municipal corporations, where the matter is not specially regulated by the charter or statute. Thus,—if the body consist of twelve common councilmen, seven is the least number that can constitute a valid meeting, though four of the seven (the seven being duly assembled and present), may act,. It was held that the legal effect of their refusal to vote while remaining present, was an acquiescence in the action of those voting." (See reference in note.)

It was contended, however, by the counsel for the appellant that there was something in conflict with this statement, in the following citation from the same work, sec. 279. "So if a board of village trustees consists of five members and all or four, are present, two can do no valid act, even though the others are disqualified by interest from voting, and therefore omit or decline to vote; their assenting to the measure voted for by the two will not make it valid. If three only were present they would constitute a quorum, then the votes of two, being a majority of the quorum would be valid; certainly so when the three were all competent to act." This was regarded in *Lawrence* v. *Ingersoll*, 88 Tennessee, 65, as an authority for counting a blank ballot for the purpose of showing that no person received a legal majority. But in the case of *The Rushville Gas Co.* v. *The City of Rushville*, 121 Ind. 210, the Indiana Court conclusively shows, that it should have no such significance. In the first sentence, by reference to the case of *Coles* v. *Trustee*, 10 Wend. 659, it is clear that the author was referring to the effect of the presence of disqualified persons, whereby there was no valid quorum present, so far as the voting was concerned. In the second sentence, he but announced the well-known principle, that where only a bare quorum was present a majority may bind the quorum. *Buell* v. *Buckingham*, 16 Iowa, 284; *Rex* v. *Monday*, Cowper, 538.

It is difficult to assign any sufficient reason why this rule concededly applicable to indefinite assemblies, should not apply also to definite. Upon what principle should a member of the Council of Annapolis by simply depositing a blank bal-

lot be enabled to prevent others from acting, who are willing to perform their duty of making an election? As was said in *Grant on Corporations*, p. 204, *et seq.*, the elector is present as an elector, his presence counts as such to make up the requisite number of electors where a certain number is necessary, but he attends only as an elector to perform the duty which is cast on him by the franchise he enjoys as an elector; he can speak only in a particular language; he can only do certain acts; any other language means nothing; any other act is merely null; his duty is to assist in making an election. If he dissents from the choice of A who is qualified, he must say so by voting for some other who is qualified; he has no right to employ his franchise merely in preventing an election, and so defeating the object for which he is empowered and bound to attend the elective assembly of the corporation."

The overwhelming weight of authority is in favor of these views. They have been applied at least as far back as the leading case of *Oldknow* v. *Wainwright*, 2 Burrows, 1017. The election there, was of a town clerk by the Mayor, Aldermen and Common Council, the entire number of electors being twenty-five, twenty-one assembled, nine of whom voted for the candidate, but twelve did not vote at all. Lord Mansfield said : "Whenever electors are present and don't vote at all, they virtually acquiesce in the election made by those who do." This case and other English cases were reviewed in *Gosling* v. *Veley*, 4 H. of L. Cases, 679, and the doctrine of Lord Mansfield in *Oldknow's case* was approved. The following were cases of elections by definite assemblies, where the same principles were affirmed. *State* v. *Parker*, 32 N. J. Law, 341; *Wheeler* v. *Commonwealth*, 98 Ky. 59; *State* v. *Young*, 19 Montana, 244; *Atty.-Genl.* v. *Shepard*, 62 N. H. 384; *Rushville Gas. Co.* v. *Rushville*, 121 Ind. 206; *State* v. *Vanosdal*, 131 Ind. 191; *Ib.* v. *Dillon*, 125 Ind. 65; *Booker* v. *Young*, 12 Grattan, 305; *Launtz* v. *People*, 113 Ill. 144; *State* v. *Green*, 37 Ohio St. 227; see also *Willcock on Mun. Corp.*, sec. 546.

We are therefore of opinion, that the appellee should have been declared elected.

The point was also raised that the appellee did not file or tender a bond within ten days after his alleged election on 20th July, and therefore his election is of no effect, and was vacated under the provisions of sec. 5 of Art. 29 and sec. 17 of Art. 26 of the City Code, which requires the Market Master to give bond, &c., to be approved by the Mayor, &c., within ten days after his election." The facts show that the Council by its presiding officer declared the appellee *not* elected—and thereby rendered the filing a bond impossible so long as that position was maintained. Subsequently, upon the Circuit Court of Anne Arundel County, deciding that Louis S. Clayton, whose case was substantially like that of the appellee, was duly elected, the Council so far retracted its position, that it became and was willing to accept the bond of the appellee. The appellee thereupon presented his bond to the Council, and it was approved by them.

It must be noted, that no objection is now made to the form or sufficiency of the bond, but that it was not presented in time. It is not within the case of *Hecht* v. *Coale*, 93 Md. 694, where a person claimed the office, without having filed a sufficient bond. Nor is it within *Archer's case*, 74 Md. 443, where the appellant had wholly failed to qualify, within one month, and the question was, could a suit be maintained on a bond, filed by the appellant at a time when he had no right to the office.

Here the question is, did the appellee by failing to present his bond within ten days after the 20th July thereby forfeit his claim to the office of Market Master.

*First.* It may be seriously questioned whether the appellee after he had been declared not elected, erroneously it is true, by the presiding officer of the Council, was in a position in which he could make any effective tender of his bond, until the Council or some Court having authority in the matter, should decide that he had been elected; and the ten days fixed for the filing of the bond should be reckoned from the date of that decision.

*Second.* But apart from this, it may be asked how could he file his bond, any sooner than he did.

On the first day of October, 1903, the Anne Arundel Court decided upon the legal principles to be applied to the case of Clayton who was one of the candidates for the various municipal offices. Then the position of the Council underwent a change, and on that day they voted to and did approve the appellee's bond.

Whether the requirement of the Code be considered as mandatory or directory, it would certainly be a harsh construction of it, to decide that under these circumstances the appellee had forfeited his claim to the office. He was prevented from filing the bond, by the conduct of the officers appointed to receive it. He was not bound to do the nugatory act of tendering it, as long as he was substantially informed it would not be received. It is his own failure that will operate against him, and not that of others who prevented. *Culver* v. *Armstrong,* 43 N. J. Rep. 776. The provisions of the law requiring the bond in a fixed time, do not apply as long as a contest is pending to determine who is elected. *People* v. *Potter,* 63 Cal. 127; *Pearson* v. *Wilson,* 57 Miss. 848. If this were not the rule, a person entitled to an office could be defeated of his right, by the mere refusal of an officer appointed to approve the bond declining to receive it. *Throop on Public Offices,* sec. 172.

It follows from what has been said that the order must be affirmed.

*Order affirmed.*

(Decided February 19th, 1904.)